NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In the matter of | : | Case No. 04-49188/JHW |
| Clarence Alfred Reath, a/k/a  Al Reath | : | |
| | : | |
| Debtor. | : | |
| Jill Cochran t/a Cochran & Company, | : | Adv. No. 05-1493 |
| Plaintiff | : | |
| v. | : | **OPINION** |
| Clarence Alfred Reath, a/k/a  Al Reath | : | |
| | : | |
| Defendant. | : | |

APPEARANCES:   John J. Palitto, Jr., Esq.
1510 Blackwood-Clementon Road
Blackwood, New Jersey    08012
Counsel for Plaintiff

Debra L. Sherlock, Esq.
Reger, Rizzo, Kavulich & Darnall, LLP
Parkview Tower, Suite 250
1150 First Avenue
King of Prussia, PA 19406
Counsel for Defendant

```
FILED
JAMES J. WALDRON, CLERK
4/27/06
U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY: s/ M. Boyer
DEPUTY
```

In this adversary proceeding, the plaintiff, Jill Cochran, trading as

"Cochran & Company," (the "Company"), seeks a determination that her claim

is nondischargeable under 11 U.S.C. § 523(a)(2)(A) and/or § 523(a)(6). The

plaintiff contends that the debtor's actions caused her to suffer a loss that was

incurred as the result of the debtor's false representations, false pretenses or

actual fraud, and/or the willful and malicious injury he inflicted her and her

business.

A trial on this adversary proceeding was conducted on October 18 and

19, 2005. The parties offered only the testimony of Reath and Cochran in

support of their positions.[1]  I conclude on this record that the plaintiff has

failed to meet her burden under either section 523(a)(2)(A) or section 523(a)(6)

and that the defendant's unliquidated debt to her, if any, may be discharged.

## FACTS AND PROCEDURAL HISTORY

The plaintiff is the sole proprietor of Cochran & Company, a business

which represents manufacturers and importers in the gift industry who sell

their products to retailers within the Company's territory, the Mid-Atlantic

---

[1]     On October 17, 2005, the defendant filed a Motion in Limine to
preclude the plaintiff from introducing any documents or witnesses at trial
given plaintiff's failure to file a Pretrial Memorandum listing same. I denied
this motion without prejudice on the first day of trial.

region.  The Company utilizes sales personnel who are employed as independent contractors ("sales reps"), each of whom has an assigned local territory in which she or he sells a variety of product lines to retailers.  The manufacturers pay the Company, referred to as a "sales repping organization," on a commission basis.  The Company, in turn, pays the sales reps a portion of the commissions based upon their sales.

The Company also represents the manufacturers at various gift industry trade shows, primarily at the Philadelphia Gift Show, held in January and July of each year.  The Company rents space at the show and hires hourly workers to set up presentation booths to display the manufacturers' products.  The commissioned sales reps then present the Company's lines to retailers during the show.

On May 1, 1995, the defendant, Clarence Alfred Reath, signed an Independent Contractor's Agreement (the "Agreement") with Cochran & Company, in which he was designated as an "I.C." or "Independent Contractor," having the sales territory of southern New Jersey.  The Agreement authorized Reath to represent the Company in selling to retailers, and provided for compensation of a commission basis. The Agreement allowed him to terminate his relationship with the Company for any reason, so long as he gave

-3-

reasonable written notice.   Conversely, the Agreement allowed the plaintiff to

terminate his employment for "good cause," defined as the "I.C.'s failure

substantially to comply with the material and reasonable requirements

imposed by Cochran for its accounts."[2]

The Agreement included a non-compete clause, which states:

AGREEMENT AGAINST COMPETITION:  In consideration of an
initial or continued relationship of I.C. with Cochran, I.C. agrees
that during the term of this Agreement, which shall include all
extensions and renewals, and for a period of one (1) year after
termination of this Agreement, however occasioned, I.C. will not:

a.    Cause or attempt to cause any manufacturer, other I.C., or
      customer of Cochran, with which I.C. worked or whose
      account I.C. supervised at any time during I.C.'s Agreement
      with Cochran, to terminate, limit, or in any matter modify or
      fail to enter into or continue in any actual or potential
      business relations with Cochran.

b.    I.C. shall not represent competing lines without the prior
      written authorization of Cochran.  Such authorization shall
      not be unreasonably withheld.

c.    I.C. covenants and agrees not to represent, either as I.C. or
      employee of another sales organization, any manufacturer
      represented by Cochran during the term of this Agreement,
      which includes all extensions and renewals and for a period
      of one (1) year after termination of this Agreement, by
      whatever means.  This paragraph shall be deemed to have
      survived for one (1) year beyond the termination of this

---

[2]      Exh. D-1, Independent Contractor's Agreement, ¶ 8.

Agreement.[3]

The Agreement signed by Reath was substantially the same standard form used for all of the Company's sales reps.[4]

According to the plaintiff, Reath served as a sales rep throughout his employment with the Company, working closely with his daughter, Yvonne Glauner, who was also a sales rep for the Company.  The plaintiff explained that Reath was not paid commissions directly by the Company because he was receiving Social Security benefits, and he had asked that his commissions be paid instead to his daughter.  Reath acknowledged that he signed the IC Agreement, but denied that he ever functioned as a sale rep for the company.[5] He claimed that he was accustomed to serve as a driver for his daughter to retail stores and to assist her with carrying and displaying product lines. Twice a year, he was hired by the Company to oversee the setup of the Company's booths for the trade shows, for which he was paid by the hour. Reath explained that he had signed the Agreement at the plaintiff's insistence, given his close working relationship with his daughter.

---

[3]     Exh. D-1 at ¶ 10.

[4]     T14-16 to 17 (10/18/05).

[5]     T149-13 through 150-9 (10/18/05).

I can readily reconcile the testimony of the plaintiff and Mr. Reath regarding Reath's role with the Company.  Reath and Glauner worked as a team, servicing the South Jersey region for the Company since 1995.   Reath, a retiree, lived with his daughter, worked in her gift shop, drove her to sales meetings, trade shows and to retailers, and assisted her in transporting her samples.  Reath assisted Glauner in securing samples from manufacturers, as evidenced by the "memo bill" invoices accompanying the samples which were addressed to him.[6]  While on the road with Glauner or in a booth at a trade show, Reath also assisted his daughter in filling out and processing retailers' orders.[7]  Reath's name was also on Glauner's business cards.  All commissions arising from their joint efforts were paid to Glauner.

Reath's responsibilities were expanded in March 2002, when he became the plaintiff's Sales Manager.  Reath's enhanced role was memorialized in a letter from the plaintiff dated February 25, 2002, with an accompanying "Sales Manager Job Description", both of which were counter-signed or initialed by Reath.[8]  The letter notes that the defendant would receive "1% of the commissions" received by the Company for sales generated by the supervised

---

[6]     Exh. P-4.

[7]     Exh. P-5.

[8]     Exh. D-2.

sales reps.  Generally, as Sales Manager, Reath was responsible to hire,

manage and motivate the sales reps.

Because Reath comprised part of a sales team with Glauner throughout

his time with the Company, even while he performed his duties as Sales

Manager starting in early 2002, Reath remained bound to the terms of the

original Agreement until his resignation from the Company in November 2003.


Reath became Sales Manager at a time when the Company's revenues,

which had grown every year since the plaintiff started doing business as

"Cochran & Company" in 1982, were declining.  Revenues declined from 2001

to 2002 and again from 2002 to 2003.  From 2002 on, many of the

manufacturers represented by the Company were lost, i.e., previously

represented wholesalers dropped the Company as their regional sales repping

organization.  Of the manufacturers who terminated their relationship with the

Company, Reath testified that Great Finds, Nature's Own, Center Street

Designs and Legacy Publishing represented "A" lines of the company, i.e., large

and profitable accounts.[9]  By the time Reath left the company in late 2003,

Reath estimated that the Company had lost nearly 50% of its business due to

the loss of the "A" lines noted.

---

[9]     T71-2 to 3, 72-4 to 5 (10/19/05).

By letter dated November 16, 2003, Reath resigned from the Company.

He wrote:

>Dear Jill,
>
>After receiving a message from Posies and Such, I am aware that
>you know of Yvonne and Diana repping the line for Sandy Sciria.
>They are also repping three other lines for Sandy.  They are Babba
>Sox, Twinklers, and Briarpatch.  I take full responsibility for
>keeping this from you.
>
>Having said this, I must also inform you that Yvonne also reps
>three lines for Van & Co.  They are Beanpod, Wongs, and Abdallah
>Candies.
>
>Now that this has made you aware and that I have been less than
>truthful about these things, I feel that I should submit my
>resignation from Cochran & Co. effective immediately.  I will offer
>my service to you for the Philadelphia Gift Show in January if you
>so desire but after the show I will no longer be involved with
>Cochran & Co.
>
>    Thank you,
>
>    Al Reath[10]

Sandy Sciria refers to a sales repping organization based in Albany that

is a competitor of the Company.  Although the Company did not represent

Posies and Such, the plaintiff had been trying to acquire the Posies and Such

line as a represented wholesaler.  Van & Co., another sales repping

organization, is also a competitor of the Company.  In Reath's letter, "Yvonne"

---

[10]    Exh. P-1.

is Yvonne Glauner, his daughter, then the Company's sales rep for southern
and central New Jersey. "Diana" is Diana Culbertson, then the Company's
sales rep in Delaware and for Maryland's Eastern Shore.[11] Following Reath's
resignation, later in November, the plaintiff fired Glauner. It appears that
Culbertson and Arrington then resigned.

The plaintiff contends that Reath terminated his relationship with the
Company in bad faith, or with malicious intent, as evidenced by the events
both preceding and following his resignation. The Company was accustomed
to having a sales meeting with all active sales reps twice a year, in the spring
and in the fall. According to the plaintiff, Reath insisted on cancelling the
spring 2003 sales meeting. Instead, in May 2003, he attended a meeting at the
home of Pamela J. Noffke, plaintiff's former secretary, who had begun her own
competing sales repping organization, Pamela J's Gifts ("Pamela J"), in 2003.
The plaintiff characterized the May 2003 session as a "sales meeting". Reath
also visited Ms. Noffke's home in October 2003. In the directory for the 2004
Philadelphia Gift Show, which was printed in November 2003, the
advertisement for Pamela J's Gifts lists Reath, Glauner, Arrington and
Culbertson as the sales reps for Pamela J. Plaintiff submits that these events

---

[11]    Not mentioned in Reath's letter was Laurie Arrington, the third
Company sales rep, whose territory was Virginia, and who was apparently also
involved in selling Posies and Such.

demonstrate Reath's defection to Pamela J, while he was still working for her

Company.  The plaintiff believes that Reath and the three sales reps, moving as

a team, initially worked for Pamela J when they left her company, and then

switched to another sales repping organization, Jack Huisman and Co., when

Pamela J ceased to operate.


Reath consistently denied that he worked for Pamela J at any time.

According to Reath, he and his daughter became friends with Ms. Noffke,

having met her while she was the plaintiff's secretary from 2001 to early 2003.

They would occasionally visit Pamela and her husband, Steven T. Noffke at

their home in Pennsylvania.  The Noffkes would reciprocate with visits to the

Reath home in New Jersey.  Reath recalls that one evening in May 2003, he

and his daughter went to visit the Noffkes, and were surprised to see several

sales reps at the home.  He acknowledges that discussions ensued regarding

sales and business matters, but denies that he or Glauner ever worked for

Pamela J.  He could not explain why his name, his daughter's name, and the

names of the two other Company reps appeared in Pamela J's advertisement in

the 2004 Philadelphia Gift Show program, but speculated that perhaps Pamela

J hoped that he and the other sales reps would come to work for the new

company at the 2004 Philadelphia Gift Show in January 2004.

Within six weeks after leaving the Company, Reath began working for

Huisman, and represented Huisman at the January 2004 Philadelphia Gift

Show.  Glauner, Arrington, and Culbertson also worked for Huisman at that

show.  While Reath believed that working for Huisman did not violate the non-

compete clause because Huisman sold "mostly garden center stuff"[12] and did

not represent lines that competed with the Company, the plaintiff described

Huisman as a direct competitor.  She claimed that some of the lines that the

Company had lost, such as Nature's Own and Great Finds, took on Huisman

as a sales repping organization after Reath joined Huisman.  The plaintiff

believed that after Reath and the other Company sales reps joined Huisman,

Huisman's Philadelphia sales rep approached many of the same retailers

serviced by the Company.  The plaintiff asserted that the Company not only

sold "garden center oriented" lines, but that garden centers, including some big

accounts, could and did carry more conventional giftware.[13]


Reath filed his Chapter 7 bankruptcy petition on December 15, 2004,

listing the plaintiff, trading as the Company, as an unsecured creditor.[14]  On

---

[12]    T141-14 to 18 (10/18/05).

[13]    T15-21 to 25 (10/19/05).

[14]    Due to the debtor's filing, the state action by the plaintiff against
the debtor and others, which is pending in the Court of Common Pleas in
Chester County, Pennsylvania, was stayed.

March 21, 2005, the plaintiff filed this adversary proceeding against the debtor.

She asserts that, because of the debtor's disloyalty to her and her Company, as

well as the debtor's related breaches of the Agreement and his responsibilities

as the Company's Sales Manager, any debt due her from Reath is non-

dischargeable under 11 U.S.C. §§ 523(a)(2) and (a)(6).  That is, the plaintiff

claims that Reath's conduct constituted "false pretenses, a false representation,

or actual fraud," and that Reath inflicted injuries upon her with the required

"willful and malicious" intent.


## DISCUSSION


The Bankruptcy Code ("Code") is designed to relieve debtors from the

weight of oppressive indebtedness and to provide them with a "fresh start."  In

re Cohn, 54 F.3d 1108, 1113 (3d Cir.1995).  This "fresh start" is available only

to the "honest but unfortunate debtor."  Grogan v. Garner, 498 U.S. 279, 287,

111 S. Ct. 654, 659, 112 L.Ed.2d 755 (1991); In re Fegeley, 118 F.3d 979, 983

(3d Cir.1997); In re DeBaggis, 247 B.R. 383, 388 (Bankr. D.N.J. 1999).


Not all debts owed by an individual debtor are discharged in bankruptcy.

Certain debts, listed in section 523, are excepted from discharge.  The plaintiff

has the burden of establishing all elements of a section 523 exception to

discharge by a preponderance of the evidence.  <u>Grogan</u>, 498 U.S. at 287-88,

111 S. Ct. at 659-60.  Exceptions to discharge are to be construed strictly

against creditors and liberally in favor of debtors.  <u>Cohn</u>, 54 F.3d at 1113..

To assert that her claim is non-dischargeable, the plaintiff relies on

sections 523(a)(2)(A) and 523(a)(6) of the Bankruptcy Code.

1.     <u>Section 523(a)(2)(A)</u>

Debts based upon fraud are nondischargeable pursuant to 11 U.S.C.

§ 523(a)(2)(A), which provides:

> (a)  A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt —
>
> . . .
>
> (2)  for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by —
>
> > (A)  false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

Section 523(a)(2)(A) does not define the terms false pretenses, false

representation, or actual fraud.[15]  Nor does the section expressly refer to

elements such as reliance, materiality or intent.  Nonetheless, courts have

routinely inferred requirements establishing intent, reliance and materiality in

applying section 523(a)(2)(A).  See, e.g., In re Menna, 16 F.3d 7 (1st Cir. 1994);

In re Martin, 963 F.2d 809 (5th Cir. 1992); In re Phillips, 804 F.2d 930 (6th Cir.

1986).


The frauds covered by the terms used in section 523(a)(2)(A) are those

which "in fact involve moral turpitude or intentional wrong; fraud implied in

law, which may be established without imputation of bad faith or immorality, is

insufficient."  4 LAWRENCE P. KING, COLLIER ON BANKRUPTCY ¶ 523.08[1][d] at

523-44.9 (15th Rev. Ed. 2006) [hereinafter "COLLIER"].  A false representation or

false pretense involves:  "(1) knowing and fraudulent falsehoods, (2) describing

past or current facts, (3) that were relied upon by the other party."  In re

Allison, 960 F.2d 481, 483 (5th Cir. 1992); RecoverEdge L.P. v. Pentecost, 44

F.3d 1284, 1293 (5th Cir. 1995).  "'As distinguished from false representation,

which is an express misrepresentation[,] false pretense involves an implied

---

[15]      In contrast, the text of section 523(a)(2)(B), which addresses
materially false statements regarding the debtor's financial condition,
specifically requires the debt to be incurred through the use of a written
statement:  (1) regarding the debtor's financial condition; (2) that was
materially false; (3) upon which the plaintiff had reasonably relied; and (4)
which the debtor made or published with the intent to deceive the creditor.  See
also Cohn, 54 F.3d at 1114.

misrepresentation or conduct intended to create and foster a false impression.'"

In re Brandon, 297 B.R. 308, 313 (Bankr. S.D.Ga. 2002) (quoting In re

Weinstein, 31 B.R. 804, 809 (Bankr. E.D.N.Y. 1983)).  Actual fraud "'consists of

any deceit, artifice, trick, or design involving direct and active operation of the

mind, used to circumvent and cheat another--something said, done or omitted

with the design of perpetuating what is known to be a cheat or deception.'"

RecoverEdge L.P., 44 F.3d at 1293 (quoting COLLIER ¶ 523.08[1][e] at 523-45).


To establish nondischargeability under section 523(a)(2)(A), plaintiff must

show that:

> (1) the debtor made the misrepresentations;
>
> (2) that at the time he knew they were false;
>
> (3) that he made them with the intention and purpose of deceiving
> the creditor;
>
> (4) that the creditor relied on such representations;
>
> (5) that the creditor sustained the alleged loss and damage as the
> proximate result of the representations having been made.

In re Hashemi, 104 F.3d 1122, 1125 (9th Cir.), cert. denied, 520 U.S. 1230, 117

S. Ct. 1824, 137 L. Ed.2d 1031 (1997); In re Kirsh, 973 F.2d 1454, 1457 (9th

Cir. 1992) (quoting In re Britton, 950 F.2d 602, 604 (9th Cir. 1991)).  See also

In re Reynolds, 193 B.R. 195, 200 (D.N.J. 1996); In re Cohen, 191 B.R. 599,

604 (D.N.J. 1996).

The plaintiff has failed to substantiate her contention that either the debtor's alleged breach of the Agreement, or his alleged breach of his duties as a Sales Manager, constituted false representations, false pretenses or actual fraud.  As to the Agreement, Reath agreed in the non-compete clause not to represent, either as an Independent Contractor for the Company, or as an employee of another sales organization, any manufacturer represented by the Company during the term of the Agreement, and for a period of one year after termination of the Agreement.  He also agreed not to "[c]ause or attempt to cause any manufacturer, other I.C., or customer of Cochran, with which I.C. worked or whose account I.C. supervised at any time during I.C.'s Agreement with Cochran, to terminate, limit, or in any matter modify or fail to enter into or continue in any actual or potential business relationship with Cochran."[16] The plaintiff interpreted these clauses broadly to include selling "similar products, or . . . competing for the retailers' time, dollars and store space, all of which are limited."[17]

Reath acknowledged that he commenced his employment with Jack

---

[16]    Exh. D-1, ¶ 10.

[17]    T15-21 to 23 (10/18/05).

-16-

Huisman and Co. two months after he terminated his employment with the

Company.  Such employment was not proscribed by the agreement between the

parties.  The plaintiff testified that she believes that the Huisman organization

picked up several product lines that had been represented by the Company

while Reath was working there, including Great Finds and Nature's Own.

However, the plaintiff produced no evidence that Reath caused either of those

lines to fail to continue their business relationship with the Company.  In fact,

one of the lines, Great Finds, was lost by the Company about eighteen months

before Reath left, while the other account, Nature's Own, was lost about six

months before Reath left.[18]  Nor is there direct evidence in the record that

Reath actually represented either of these lines at Huisman himself during the

one year after he left the Company.


Reath testified that while he was working for Huisman, he had contact

with some of the same customers that were serviced by Cochran.[19]  He

correctly noted that the non-compete clause of the Agreement did not bar him

from having any contact with Cochran's customers.  The only type of contact

that was proscribed was any attempt by the debtor to cause a customer to

---

[18]     The Company lost the Great Finds account in June 2002, and lost
the Nature's Own line in March 2003.

[19]     Id. at T142-7 to 20.

limit, modify or fail to continue in any actual or potential business relationship

with Cochran.  No such specific proofs were adduced.


The proofs presented do not substantiate the conclusion that the debtor

breached either of these provisions of the Agreement.  Even if Reath breached

the Agreement through his contact with the plaintiff's customers, post

resignation, there is no support for the proposition that such breach

constituted false representations, false pretenses or actual fraud.


Further, the plaintiff has failed to establish that the debtor began to work

for another sales repping organization, Pamela J's, before he resigned from the

Company, or that he solicited the plaintiff's other sales reps to leave the

plaintiff, or to cause the other sales reps to solicit product lines that competed

with the plaintiff's customers.  The plaintiff has established only that:

1.    Reath was at Pamela J's home on two occasions, in May and
      October, 2003;

2.    In May, other Company sales reps were at the Noffke home at the
      same time;

3.    Reath and two of the Company's active sales reps, Glauner and
      Culbertson, were listed as Pamela J's sales reps in a publication
      that was printed around November 2003;

4.    Reath acknowledged in his November 16, 2003 letter of resignation
      that he failed to inform the plaintiff that several sales reps were

repping several product lines for two of the plaintiff's competitors,
and

5. Reath and the Company's three active sales reps, including
Glauner, Culbertson and Arrington, commenced their employment
with Huisman, a competitor of the plaintiff, in January 2004.

Reath testified credibly that he had never worked for Pamela J's, and
that he did not know why he was listed as a sales rep in the publication. He
also testified credibly that he discovered that Glauner and Culbertson were
repping several product lines for competing organizations at the end of October
2003. He failed to inform the plaintiff promptly because he wanted to give the
sales reps a chance to inform the plaintiff on their own.[20] He went on vacation
in early November, and discovered when he came back that the plaintiff knew
about the activities of Glauner and Culbertson. There is no evidence in this
record of any sort that Reath solicited the sales reps to represent competing
product lines or to join a competing sales repping company.

The plaintiff also contends that the debtor fraudulently breached his
obligations as Sales Manager because he represented that "he would manage
the sales force [and] [t]he representation at some point became false when his -

---

[20] Subsection b of ¶ 10, the non-compete clause of the Independent
Contractor Agreement, permits an Independent Contractor to represent
competing lines with "the prior written authorization of Cochran . . . [which]
shall not be unreasonably withheld."

when he repped other lines while working, while his force was working for others, and he did nothing about it."[21]  It is recognized that a debtor's silence regarding a material fact can rise to the level of fraud, where it regards a material fact.  In re Docteroff, 133 F.3d 210, 216 (3d Cir. 1997); In re Trombadore, 201 B.R. 710, 714 (D.N.J. 1996), aff'd, 129 F.3d 1256 (3d Cir. 1997).  However, the debtor's silence regarding the activities of the sales reps in late October and early November 2003 does not rise to that level.  In delaying to impart information about the sales reps to the plaintiff, Reath acted within his discretion as Sales Manager to offer the sales reps the opportunity to seek plaintiff's authorization to represent non-Company lines, as allowed by ¶ 10.b of the Independent Contractor Agreement.  Following a brief interval of approximately two to three weeks, Reath informed the plaintiff of the situation.

More broadly, the plaintiff suggests that the debtor conspired to impair the plaintiff's business by working for Pamela J's while he acted as the Company's Sales Manager, solicited or caused the sales reps to represent other product lines and competitors of the Company, and generally violated his duty of loyalty, as Sales Manager, to the Company.  The plaintiff has failed to establish these allegations as well.  The debtor testified credibly that he never

---

[21]      T69-12 to 16 (10/19/05).

worked for Pamela J's.  The only evidence produced regarding such alleged

employment was the debtor's presence at Ms. Noffke's home on two occasions,

and his listing as a representative of Pamela J in a publication printed in

November, 2003.  Nor is there evidence in this record to support the

proposition that the debtor solicited or encouraged the other sales reps to

violate their non-compete clauses.  The fact that the debtor and the three sales

reps who were fired or resigned after Reath resigned in November became

employed by the same sales repping organization six weeks later does not

provide sufficient basis to establish a "deceit, artifice, trick or design" employed

by the debtor that would be reflective of actual fraud.  RecoverEdge LP, 44 F.3d

at 1293.[22]

Even if the plaintiff successfully established that the debtor breached his

Agreement with the Company in some way, or breached his duty to the

Company as a Sales Manager, such breaches would not necessarily constitute

false representations, false pretenses, or actual fraud.  Without a

demonstration of an intent to deceive, proof of a breach of contract cannot

---

[22]      In fact, plaintiff's counsel acknowledged at trial that the "actual
fraud" standard would not apply:  "I believe I must concede under both New
Jersey and Pennsylvania law for actual fraud, there must be a representation
which was false at the time that it was made, and I don't think we can show
that."  T65-11 to 15 (10/19/05).

-21-

support a section 523(a)(2)(A) non-dischargeability finding.

> A bare promise to be fulfilled in the future, which is not carried
> out, does not render a consequent debt nondischargeable under §
> 523(a)(2)(A).  Schwalbe v. Gans (In re Gans ), 75 B.R. 474, 486
> (Bankr. S.D.N.Y. 1987).  An unfulfilled promise to perform in the
> future is actionable only in contract.  It is insufficient under §
> 523(a)(2)(A) simply to show that debtor left unfulfilled a prior oral
> representation or promise.  Were this showing sufficient, virtually
> every oral obligation would give rise to a nondischargeable debt
> under § 523(a)(2)(A).  A fraudulent promise under § 523(a)(2)(A)
> requires proof that at the time the debtor made it, he or she did
> not intend to perform as required.  Seepes v. Schwartz (In re
> Schwartz ), 45 B.R. 354, 357 (Bankr. S.D.N.Y. 1985).  In other
> words, Plaintiff herein must establish that Defendant had no
> intention of repaying when he obtained the loan and she has failed
> to do so.  We recognize that fraudulent intent, intent to deceive or
> scienter can be inferred, since direct proof of state of mind is rarely
> available.  Plaintiff, however, errs in assuming fraudulent intent
> can be presumed.  Fraudulent intent may be inferred; it cannot be
> presumed.

In re Balzano, 127 B.R. 524, 531 (Bankr. E.D.N.Y. 1991).

Here, there is no support for either the proposition that the debtor did

not intend to perform his duties as an Independent Contractor or as the Sales

Manager for the Company when he agreed to act in those capacities, or that he

intended to deceive the plaintiff in any way by his activities.  While Reath may

have had a "continuing obligation" to abide by his employment agreements as a

matter of contract law, any breach by the debtor of his contractual obligations

to the plaintiff does not give rise to the necessary intent to deceive by the

debtor which is required under section 523(a)(2)(A).  Plaintiff has failed to meet

her burden to show that the defendant's debt to her, if any, should be declared

non-dischargeable under 11 U.S.C. § 523(a)(2)(A).


      2.    <u>Section 523(a)(6)</u>


Section 523(a)(6) provides that:


> (a)    A discharge under section 727, 1141, 1228(a), 1228(b),
> or 1328(b) of this title does not discharge an individual debtor from
> any debt—
> > . . .
>
> (6)    for willful and malicious injury by the
> debtor to another entity or to the property of another
> entity.

11 U.S.C. § 523(a)(6).  Section 523(a)(6) requires an act that is both "willful"

and "malicious".  "Willful" is generally understood to mean voluntary,

intentional or deliberate.  <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 61 n.3, 118 S. Ct.

974, 977 n.3, 140 L.Ed. 2d 90 (1998).  "The word 'willful' in (a)(6) modifies the

word 'injury,' indicating that nondischargeability takes a deliberate or

intentional injury, not merely a deliberate or intentional act that leads to

injury."  <u>Id</u>. at 61, 118 S. Ct. at 977. "[R]ecklessly or negligently inflicted

injuries do not fall within the compass of § 523(a)(6)."  <u>Id</u>. at 64, 118 S. Ct. at

978.  See also In re Hawkins, 231 B.R. 222, 228 (D.N.J. 1999).

The Supreme Court did not specify the precise mental state necessary to rise to the level of "willful and malicious."  In re Conner, 302 B.R. 509, 514 (Bankr. W.D.Pa. 2003) (citing to In re Jercich, 238 F.3d 1202, 1207 (9th Cir.), cert. denied, 533 U.S. 930, 121 S. Ct. 2552, 150 L.Ed.2d 718 (2001)). "As a result, appellate courts have taken both an objective and subjective approach to the inquiry."  In re Peterson, 332 B.R. 678, 682 (Bankr. D.Del. 2005) (citing Conner, 302 B.R. at 514).  "Under the subjective approach, an injury is willful and malicious if the debtor caused harm through a deliberate action with the belief that there was a  substantial certainty of injury.  In contrast, under the objective approach, an injury is willful and malicious if the debtor caused harm through a deliberate action with an objective  substantial certainty of injury."  Peterson, 332 B.R. at 682-83 (emphasis in original) (citing Conner, 302 B.R. at 515 n.4).

The Third Circuit has not revisited the issue since Geiger.  In In re Conte, 33 F.3d 303 (3d Cir.1994), decided before Geiger, the Third Circuit arguably endorsed an objective approach.  In re Conner, 302 B.R. at 515 n.4.  In Conte, the Third Circuit held "that actions are willful and malicious within the

-24-

meaning of § 523(a)(6) if they either have a purpose of producing injury or have

a substantial certainty of producing injury." Conte, 33 F.3d at 307.  Quoting

the Restatement (Second) of Torts, the Third Circuit found that the word

"'intent ... denote[s] that the actor desires to cause consequences of his act, or

that he believes that the consequences are substantially certain to result from

it.'" Id. at 308 (emphasis in original) (quoting RESTATEMENT (SECOND) OF TORTS §

8A (1979)).  Thus,

> Intent is not . . . limited to consequences which are desired.  If the
> actor knows that the consequences are certain, or substantially
> certain, to result from his act, and still goes ahead, he is treated by
> the law as if he had in fact desired to produce the result.  As the
> probability that  the consequences will follow decreases, and
> becomes less than substantial certainty, the actor's conduct loses
> the character of intent and becomes mere recklessness.

Id. (quoting RESTATEMENT (SECOND) OF TORTS § 8A cmt. B (1979)).  See also

Reynolds v. Reynolds, 193 B.R. 195, 203 (D.N.J. 1996); In re Casini, 307 B.R.

800, 820 (Bankr. D.N.J. 2004) (the exception requires an actual intent to cause

injury); In re Groff, 301 B.R. 644, 650 (Bankr. D.N.J. 2003).


 "[R]ecklessly or negligently inflicted injuries do not rise to the level of

'willful and malicious.'" Peterson, 332 B.R. at 682 (citing Geiger, 523 U.S. at

64, 118 S. Ct. at 978).  As such, a knowing breach of contract will not

ordinarily rise to the level of "willful and malicious." Id. at 62, 118 S.Ct. at

977.  See also In re Lazzara, 287 B.R. 714, 722 (Bankr. N.D.Ill. 2002) (stating

that debts for intentional "breach of contract are not excepted from discharge").

    In a case including an employee who breached a covenant not to compete

and took proprietary information with him, Judge Scholl of the Eastern District

of Pennsylvania held that the plaintiff employer demonstrated non-

dischargeability under 11 U.S.C. § 523(a)(4) on the ground of embezzlement,

but not under section (a)(6).  In re Harland, 235 B.R. 769, 775-82 (Bankr. E.D.

Pa. 1999).  About section 523(a)(6), he stated:

> We believe that sustaining the Plaintiff's § 523(a)(6) cause of
> action on the basis of its claim for breaches of contract would
> result in precisely the result which the Court, in Kawaauhau v.
> Geiger, stated would attend an erroneous, broad interpretation of §
> 523(a)(6).  Here, the Debtor clearly acted intentionally, and his
> actions clearly resulted in injury to the Plaintiff.  However, by the
> very terms of State Court's findings, the Debtor's intent was
> focused entirely on maximizing his personal financial interests, not
> intentionally harming the Plaintiff.  The injury which resulted
> flowed from the Debtor's breaches of his contract, but there is no
> finding that it actually was a goal of the scheme he pursued, as
> opposed to the goal of benefitting himself.  We must therefore hold
> that the instant record is insufficient to support the Plaintiff's
> claims under § 523(a)(6).

Id. at 779.

    A more expansive view of Geiger and section 523(a)(6) was taken in the

Butler case from the Central District of Illinois, in which an ophthalmologist

violated a covenant not to compete with the medical association with which he

had been associated, violated a series of state court injunctions and was ruled

in civil contempt.  The court concluded that the record amply demonstrated the

debtor's willfulness and maliciousness for purposes of section 523(a)(6)

nondischargeability.  In re Butler, 297 B.R. 741, 745-49 (Bankr. C.D.Ill. 2003).

See also In re Sarff, 242 B.R. 620, 623-27 (6th Cir. BAP 2000) (affirming

bankruptcy court's determination that debtor's violation of covenant not to

compete had been intentional, and his debt non-dischargeable).  "The

willfulness and malice required by 11 U.S.C. § 523(a)(6) is demonstrated by

[the state court trial judge's] finding that Debtor repeatedly and purposefully

engaged in acts which he knew to be in violation of the covenant not to

compete and the trial court's preliminary injunction orders."  Butler, 297 B.R.

at 748.  The Butler court noted that,

> Debtor may dispute that he subjectively intended to injure
> Plaintiff by intentionally violating the covenant not to compete,
> thereby breaching the Employment Contract.  However, Debtor
> does not (and could not) seriously dispute the fact that he had
> subjective knowledge that injury to Plaintiff was substantially
> certain to result from his intentional acts.  He clearly knew that
> violating the covenant not to compete would cause financial harm
> to Plaintiff, yet he knowingly violated the covenant anyway.  As
> indicated above and as established by precedent, that is all that is
> required to meet the standard of nondischargeability set forth in
> Geiger.

Id. at 749 (citations omitted).

Whether the <u>Harland</u> or the <u>Butler</u> approach is taken, there is no basis in this record to conclude that Reath inflicted a deliberate and intentional injury, with malice, upon the plaintiff or her Company in any way.  His failure to promptly inform the plaintiff about the competing product lines being represented by the Company's sales reps was occasioned by his desire to afford the sales reps the chance to take up the issue directly with the plaintiff.  The competing product lines were not large accounts.  The record does not reflect when the sales reps began to sell these lines, or whether the debtor had any involvement at the outset of their representation of the competing lines.  The debtor's resignation did not violate the agreement between the parties.  We do not know how it happened that the debtor and three of the sales reps all went to work for Huisman in January 2004.  The lines acquired by Huisman in January 2004 had been lost by the Company in 2002 and March 2003. Huisman picked up one line formerly represented by the plaintiff, Spin Shades, in November 2003, but no evidence was offered that Reath had any involvement in that arrangement.  These facts do not support the conclusion that the debtor either caused harm to the plaintiff through a deliberate action with the belief that there was a substantial certainty of injury, or that the debtor caused harm through a deliberate action with an objective substantial certainty of injury.  <u>See</u> <u>Peterson</u>, 332 B.R. at 682-83.

I conclude that the plaintiff has failed to establish the requisite elements of either section 523(a)(2)(A) or 523(a)(6).  Judgment in favor of the defendant shall be entered.  The defendant's counsel shall submit a form of order.[23]

Dated: April 27, 2006

JUDITH H. WIZMUR
CHIEF U.S. BANKRUPTCY JUDGE

---

[23]    The defendant's motion for sanctions against the plaintiff for FED.R.BANKR.P. 9011 violations is denied.  The complaint was not presented for an improper purpose, such as to harass or a cause delay.  R. 9011(b)(1).  The claims of the plaintiff seeking nondischargeability of the debt allegedly due to her from the debtor were warranted under existing law.  R. 9011(b)(2).  The plaintiff's factual contentions had evidentiary support, but were simply insufficient to establish the elements of non-dischargeability asserted by the plaintiff.  R. 9011(b)(3).

-29-